IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Dawn Page Finley-Bayne,　　　　　　) | Civil Action No. 6:13-290-RBH-KFM |
| 　　　　　　　　　　Plaintiff,　　) | |
| | **REPORT OF MAGISTRATE JUDGE** |
| 　　vs.　　　　　　　　　　　　) | |
| | |
| Carolyn W. Colvin,　　　　　　) | |
| Commissioner of Social Security,[1]　) | |
| | |
| 　　　　　　　　　Defendant.　) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on April 13, 2009, alleging that she became unable to work on August 28, 2008. The application was denied initially and on reconsideration by the Social Security Administration. On July 30, 2010, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Carroll H. Crawford, an impartial vocational expert, appeared on July

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

21, 2011, considered the case *de novo* and, on September 12, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on November 30, 2012. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)     The claimant last met the insured status requirements of the Social Security Act on December 31, 2010, but not thereafter.

(2)     The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 28, 2008, through her date last insured of December 31, 2010 (20 C.F.R. § 404.1571 *et seq.*).

(3)     Through the date last insured, the claimant had the following severe impairments: asthma, chronic obstructive pulmonary disease, obesity, and hypertension (20 C.F.R. § 404.1520(c)).

(4)     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)     After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform simple routine unskilled light work as defined in 20 C.F.R. § 404.1567(b) with lifting and carrying 20 pounds occasionally and 10 pounds frequently; no prolonged standing and walking; requiring ability to alternate sitting and standing every 30 minutes; with no exposure to excessive dust, fumes, gases, odors, extremes of temperature or humidity; with no working at heights or around dangerous machinery; with no climbing, balancing or operating automotive equipment; with occasional stooping, kneeling, crouching and crawling. If someone can do light work, we determine that he or she can also do sedentary work.

2

(6)    Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)    The claimant was born on May 15, 1966, and was 44 years old, which is defined as a younger individual age 18-49, on the date last insured (20 C.F.R. § 404.1563).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)    Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11)    The claimant was not under a disability, as defined in the Social Security Act, at any time from August 28, 2008, the alleged onset date, through December 31, 2010, the date last insured (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

3

has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by

substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### *Medical Evidence*

The plaintiff first saw Robert Vande Stouwe, M.D., Ph.D., in 2005 for treatment of allergy and asthma problems that had recently become more severe (Tr. 353). In a letter dated February 17, 2008, Dr. Vande Stouwe reported that the plaintiff had a very high level of inhalant allergy and had been on allergy immunotherapy for nearly two years. She continued to have problems with asthma exacerbations and recurrent respiratory infections. Recently, the plaintiff had been unable to receive her allergy injections because of her worsened symptoms (Tr. 350).

On March 11, 2008, the plaintiff presented to South Carolina Oncology Associates with complaints of abdominal discomfort and swelling (Tr. 216-17). A CAT scan revealed a mass in the left pelvis. On March 25, 2008, a repeat CAT scan of the abdomen and pelvis revealed a fatty liver, a small right renal cyst, and a cystic left mass in the pelvis, which was likely ovarian (Tr. 219).

An x-ray of the right knee was taken on June 30, 2008, after the plaintiff reported that she had fallen and injured her knee. The x-ray revealed a large joint effusion and MCL strain (Tr. 236, 238). A right upper quadrant ultrasound also taken on June 30, 2008, revealed an echogenic liver with fatty infiltration and a calculus of the lower pole of the right kidney (Tr. 237).

On July 7, 2008, the plaintiff presented to Joseph S. Rice Jr., M.D., at Columbia Gastroenterology Associates, with complaints of a right upper quadrant pain, abdominal bloating, and frequent nausea and vomiting (Tr. 230). In treatment notes dated August 19, 2008, Dr. Rice indicated that the results of a recent colonoscopy were normal. However, he noted that the plaintiff had reported significant nausea and vomiting, which he believed was consistent with gastroesophageal reflux. Dr. Rice also noted that the plaintiff was markedly overweight (Tr. 229).

On August 21, 2008, the plaintiff saw Martha Parker-Hester, M.D., for treatment of bronchitis. Along with bronchitis, she was diagnosed with stable hypertension, allergies, and anxiety/insomnia (Tr. 235).

On August 31, 2008, the plaintiff was taken by ambulance to the emergency room at Providence Hospital. She complained of difficulty breathing, productive cough, sore throat, nausea, vomiting, and diarrhea that had lasted for approximately five weeks. She also complained of sharp pain in her lower back, which she rated as a seven out of ten (Tr. 243). Hospital records indicate that a provider went to evaluate the plaintiff, but she

was not in the room, and the gown was left on her bed, so it was assumed that the plaintiff had left the treatment area (Tr. 244).

On October 2, 2008, the plaintiff saw Rosa Jimenez, M.D., for an initial primary care evaluation for severe asthma and allergies. Dr. Jimenez noted that the plaintiff had an abnormal EKG and referred her for a cardiolite scan (Tr. 283-91). On October 15, 2008, the scan showed abnormal SPECT cardiolite image with mild anterior wall reversible ischemia and normal left ventricular systolic function (Tr. 280-281). On the same date, a transthoracic echocardiogram revealed mild concentric left ventricular hypertrophy, Doppler findings of diastolic dysfunction physiology, mildly enlarged right ventricle, and mildly thickened mitral valve leaflets (Tr. 298).

On October 17, 2008, the plaintiff returned to Dr. Vande Stouwe, who reported that physical examination showed mild nasal congestion and clear lungs (Tr. 349). Spirometry testing showed moderate obstruction with improvement after using a bronchodilator (Tr. 349).

On October 31, 2008, the plaintiff was referred to Leon Khoury. M.D., at the South Carolina Heart Center regarding the abnormal cardiolite stress test due to hypertension, hyperlipidemia, and an abnormal EKG. Dr. Khoury reported that the plaintiff had reactive airway disease, hypertension, borderline glucose intolerance, hyperlipidemia, chest pain with activity, and an abnormal nuclear scan. An echocardiogram was normal. Dr. Khoury stated that the plaintiff had a number of risk factors for heart disease and recommended proceeding with a left heart catheterization (Tr. 245-47). On November 7, 2008, the catheterization was performed and showed normal coronary angiography and normal left ventricular systolic function (Tr. 254-55).

On December 4, 2008, Dr. Vande Stouwe wrote a letter for purposes of the plaintiff's disability claim, stating that the plaintiff had asthma that had been difficult to control. He stated that the plaintiff's symptoms worsened with little exertion as well as with

7

exposure to assorted chemicals and scents in her workplace. Her most recent spirometry results showed marked obstruction with Forced Expiratory Volume in the first second ("FEV1") of only 41% predicted (Tr. 346). Dr. Vande Stouwe wrote that, in his medical opinion, the plaintiff's asthma was disabling, and she was unable to do any type of work for at least one full year (Tr. 346).

The plaintiff reported to Doctor's Care on December 29, 2008, for an acute exacerbation of chronic bronchitis. She was noted to have end-expiratory wheezes, mild rhonchi, and rales. She was given medication and told to follow up with her primary care physician and allergist (Tr. 262). The plaintiff had a follow up with Dr. Jimenez on February 2, 2009. Dr. Jimenez reported that the plaintiff had severe steroid dependent asthma and was on recurrent antibiotics. She complained of having painful urination for two days (Tr. 276). Dr. Jimenez ordered a CT scan of the abdomen and pelvis, which showed two small stones in the kidneys and a tiny stone in the ureteropelvic junction area without evidence of obstruction (Tr. 297).

On May 18, 2009, the plaintiff saw Mark Mayson, M.D., on a referral from Dr. Jimenez for evaluation of her chronic asthma. Dr. Mayson noted that the plaintiff had suffered from asthma since she was six years old, but that it had worsened significantly and had resulted in several hospitalizations (Tr. 313). On examination, the plaintiff's sinuses were somewhat congested and non-tender, with no significant inflammation. Lung examination revealed diffuse wheezes (Tr. 314). Pulmonary function testing revealed a mixed obstructive and restrictive pattern. He noted that the plaintiff had tried several different medications including inhalers, but that her asthma had not been controlled without the use of prednisone. He noted that she was "almost completely steroid dependent" (Tr. 313). Dr. Mayson diagnosed severe asthma that was apparently steroid dependent and underlying allergies with sinopulmonary syndrome. Dr. Mayson reported that the plaintiff was on an excellent medication regimen and was also using nasal lavage

8

with a Neti pot (Tr. 314).   At the end of May, Dr. Mayson performed a fiber optic bronchoscopy, which was normal and showed patent airways without endobronchial lesion, obstruction, or purulence (Tr. 323).

The plaintiff returned to Dr. Jimenez on June 3, 2009, with complaints of a rash, shortness of breath, and vomiting related to Mucinex.  On examination, the plaintiff's lungs were clear to auscultation bilaterally with good air movement and without rhonchi or wheezing.   She had some discomfort upon palpation of her epigastrium in the right quadrant area.  Dr. Jimenez also noted that the plaintiff presented in acute anxiety attack.  Dr. Jimenez was unsure if the plaintiff's problem was related to increased anxiety issues after she had vomiting from taking Mucinex (Tr. 271).   She ordered an ultrasound that showed mild diffuse fatty infiltration of the liver, no gallstones, and probable calcification within the right kidney (Tr. 293).

On June 11, 2009, Dr. Jimenez completed a questionnaire regarding the plaintiff's mental functioning.  Dr. Jimenez reported that the plaintiff was diagnosed with insomnia and anxiety, but had no work-related limitation in function due to a mental condition and was capable of managing her own funds (Tr. 268).

The plaintiff saw Dr. Mayson again on June 17, 2009.  Dr. Mayson reported that the plaintiff's Immunoglobulin E ("IgE") level was markedly elevated, and thus she might be a candidate for the asthma drug Xolair.  She had a low grade fever of 100.1 and continued to have intermittent wheezing and coughing, along with some sinus congestion and drainage (Tr. 312).

In a letter dated June 23, 2009, Dr. Vande Stouwe reported that the plaintiff's asthma had been fairly difficult to control and that she was on immumotherapy, but she had not required Prednisone recently.  Physical examination was normal except for mild nasal congestion.  Spirometry showed moderate airway obstruction.  Dr. Vande Stouwe noted that the plaintiff had reflux symptoms fairly regularly and Prilosec on most days, but not

every day.  He instructed her to take an increased dosage of Prilosec daily and kept her asthma medications the same (Tr. 341).  A CT scan of the sinuses taken on June 22, 2009, showed some minor thickening in the right maxillary antrum and a polypoid area of thickening in the left maxillary antrum (Tr. 315).

On July 13, 2009, Dr. Jimenez completed a second questionnaire regarding the plaintiff's mental functioning (Tr. 391).  She indicated that the plaintiff had a slight work-related limitation due to her anxiety and was capable of managing her own funds (Tr. 391).

The plaintiff saw Dr. Jimenez again on July 29, 2009, and complained of neck pain (Tr. 464).  Dr. Jimenez ordered an MRI, which showed mild to moderate degenerative disc disease of the cervical spine at C5-C6 and likely at C6-C7, although the C6-C7 level was not visualized due to overlying shoulder (Tr. 659).

On August 5, 2009, state agency medical consultant Rebecca Meriwether, M.D., reviewed the plaintiff's medical records and offered a physical residual functional capacity ("RFC") assessment (Tr. 408-15).  Dr. Meriwether opined that the plaintiff could lift ten pounds frequently and 20 pounds occasionally; sit, stand, or walk, for six hours each in an eight-hour workday; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and must avoid even moderate exposure to extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation (Tr. 408-15).

The plaintiff went to the emergency room on August 21, 2009, and again in October 2009 for treatment of possible allergic reactions and difficulty breathing (Tr. 528-31, 550-54).  On both occasions, the plaintiff's priority was deemed non-urgent, and she was treated and discharged home with diagnoses of asthma and chronic obstructive pulmonary disease ("COPD") (Tr. 531, 554).  The plaintiff saw Tab Thompson, M.D., at Palmetto Ear, Nose, and Throat for follow up on October 7, 2009, and November 12, 2009, and was diagnosed with chronic rhinosinusitis with turbinate dysfunction (Tr. 420-24).  On

10

December 15, 2009, Dr. Thompson performed sinus surgery, including bilateral endoscopic antrostomies with removal of tissue maxillary sinuses; bilateral endoscopic anterior ethmoidectomies; and bilateral endoscopic inferior turbinate reduction (Tr. 423-24).

The plaintiff saw Dr. Jimenez twice at the end of January 2010 with complaints of a severe asthma attack (Tr. 448-51). She was placed back on prednisone for treatment (Tr. 451). On February 4, 2010, treatment notes from Palmetto Ear, Nose, and Throat indicate that the plaintiff was being treated for bronchitis (Tr. 598). The next day, Dr. Jimenez reported that the plaintiff's lungs sounded better than they did the week prior with much better air movement, but still significant increase in expiratory time and rhonchi that move only partially to coughing (Tr. 446). She also noted that the plaintiff had diabetes and high blood pressure. On February 18, 2010, treatment notes from Palmetto Ear, Nose, and Throat indicate that the plaintiff was doing much better with no wheezing (Tr. 599). Progress notes from March 2010 indicate that the plaintiff weighed 240 pounds (Tr. 444).

On March 3, 2010, the plaintiff saw J. Daniel Love, M.D., at Palmetto Pulmonary for evaluation of asthma (Tr. 629-30). Dr. Love noted that the plaintiff has had episodes of angioedema and marked, persistent breathlessness with significant impairment of activities of daily living. His assessment was that the plaintiff suffered from very severe asthma, and he noted that she had a "strong family history for asthma severity with pulmonary-related deaths" (Tr. 630). Dr. Love reported that the plaintiff's flow-volume loop demonstrated a moderate reduction in the forced vital capacity and FEV1 with a mild reduction of the ratio (Tr. 630). However, he noted that those results were on persistent, significant doses of prednisone (Tr. 620). He instructed the plaintiff to begin to taper the prednisone slowly and noted that some consideration needed to be given to an alternative treatment for management. He stated that, in his opinion, disability was unavoidably present. He recommended that the plaintiff be seen at Duke University hospital because

11

of the complexity of her problem and the increased risk of early complications associated with it (Tr. 630).

On March 5, 2010, the plaintiff saw Dr. Jimenez and was advised that the lower dosage of prednisone should help her diabetes control (Tr. 443).

On April 20, 2010, the plaintiff was seen for pulmonary consultation at Duke University Hospital on referral from Dr. Love (Tr. 724-28). Michael Russell, M.D., reported that on physical examination the plaintiff's chest was clear to percussion; she had good air movement; she had bilateral wheezing on respiration; and she had prolonged expiratory phase on forced exhalation. Dr. Russell noted that the plaintiff was recently off systemic steroids, but had wheezing at baseline. He suggested that she would benefit from a long-acting beta-agonist. He noted that the plaintiff had multiple triggers, including inhalants and specific foods. He believed the plaintiff would benefit from a dietary consultation for weight reduction and regarding possible allergens that she should avoid. He also stated that she should increase her avoidance of allergens and that having a bird and dogs in the house was a concern (Tr. 727). He reported that the plaintiff had symptoms suggestive of obstructive sleep apnea and advised her to lose weight. There were no significant changes in her recommended therapy (Tr. 728).

The plaintiff saw Dr. Love again on April 22, 2010. Dr. Love noted that the plaintiff had been seen at Duke but that there were no significant recommendations for a change in therapy. The plaintiff's forced vital capacity had increased about 5% from the previous month, and the FEV1 measurement had increased from 1650 to 1810. The forced vital capacity/FEV1 ratio remained 67%, indicating mild obstruction. Dr. Love advised the plaintiff to continue Asmanex and inhaled therapy as needed and to reduce caloric intake by at least 500 calories per day (Tr. 628).

On May 13, 2010, state agency medical consultant Mary Lang, M.D., reviewed the plaintiff's medical records and completed a physical RFC assessment, stating

12

her opinion that the plaintiff could lift ten pounds frequently and 20 pounds occasionally; sit, stand, or walk for six hours each in an eight-hour workday; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and must avoid even moderate exposure to extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation (Tr. 520-27).

In June 2010, Dr. Love reported flow-volume loop showed a decrease in forced vital capacity with little change in the FEV1, with a ratio of 71%. Dr. Love's assessment included markedly labile asthma with multiple inhalant risks, current acute sinusitis developing, significant alteration of activities of daily living, with impairments sufficient for disability (Tr. 627).

On September 28, 2010, Dr. Love reported that the plaintiff had lost about ten pounds and was asking about reducing some of her medications (Tr. 623). She had not been on prednisone recently and had no recent sinusitis. She had an insignificant increase in forced vital capacity and a reduced ratio from 71% to 68%, with mild obstruction and mild restriction. Dr. Love reported that the plaintiff had relative improvement in her pattern of asthma but he noted concern about "other health issues" (Tr.623). He recommended she continue her inhaled therapy and follow up with Dr. Jimenez to monitor her blood sugar.

In November 2010, the plaintiff was seen at Palmetto, Ear, Nose, and Throat for complaints including otalgia, paroxysmal nocturnal dyspnea, and dizziness (Tr. 599). The next month, the plaintiff reported that she felt better, she could breathe better, and her dizziness was infinitely better. Physical examination showed no purulence and no polyps (Tr. 600).

The plaintiff was seen by Dr. Jimenez on February 8, 2011, with assessment including asthma, type II diabetes mellitus, gastroesophageal reflux diseas ("GERD"), hyperlipidemia, hypertension, obesity, and chronic sinusitis. In March 2011, Dr. Love reported that the plaintiff had been off steroids and off antibiotics. Flow-volume loop

13

showed moderate reduction in forced vital capacity and severe reduction in FEV1, but with a 69% ratio and only mild obstruction (Tr. 622).

On May 10, 2011, the plaintiff saw Dr. Jimenez for a follow up with additional complaints of bronchitis, allergic rhinitis, and osteoarthritis. Dr. Jimenez recommended that the plaintiff consider a sleep study and that she continue to follow up with both Dr. Vande Stouwe and Dr. Mayson. Dr. Jimenez reported that the plaintiff's diet was better (Tr. 642).

On July 14, 2011, the plaintiff saw Dr. Mayson and was diagnosed with severe asthma and sinopulmonary syndrome. Her asthma had worsened recently with increased wheezing and coughing. Dr. Mayson noted that the plaintiff had already been using a Neti pot and suggested that she continue. He wanted to see if she had ongoing sinusitis and potentially obtain cultures as she may have a drug-resistant organism. He stated they would try to avoid using any more prednisone and the plaintiff would try Pulmicort with her nebulizer, which she thought seemed to help her better. They would also pursue Xolair with the patient assistance program to see if it might help her get her allergies and asthma under better control. Dr. Mayson stated that, although the plaintiff responded well to prednisone, it caused her diabetes to become "out of control" (Tr. 717).

### Plaintiff's Reports and Testimony

In a function report completed in June 2009, the plaintiff reported living in a house with her family and taking care of pets. Her husband would help her with the pets if he was in town. She had no problem with personal care and would prepare meals daily, depending on how she felt. She washed dishes daily and did the laundry weekly. She would have a cleaning service clean for her because the fumes and dust would aggravate her conditions. She went outside daily and could drive a car. She shopped in stores, by phone, by mail, and by computer for food, medicine, and clothing. Her hobbies included reading, television, her pet, and playing chess. She could pay attention as long as she needed to (Tr. 167-72).

14

At the hearing in September 2011, the plaintiff testified she had asthma for her entire life, and it had been getting worse since 2008. Treatment was usually prednisone, "which is wonderful for making asthma better" but made her blood sugar "go nuts" (Tr. 37-38). She was extremely sensitive to perfumes, cleaning products, room deodorizers, and similar odors, which would cause problems with her breathing (Tr. 38). Exertion caused her shortness of breath, which lasted 20 minutes on a good day and did not go away on a bad day. She used an inhaler, nebulizer, and EpiPen for relief (Tr. 39). She did not sleep very well at night, as she had to sit up straight or at a 90-degree angle because she felt like she was suffocating when she lay flat (Tr. 42). She had problems regulating her blood sugar, especially when on prednisone (Tr. 44). She had problems with anxiety and took Xanax (Tr. 45-46).

The plaintiff testified that she did not dine out often because she had numerous food allergies and that exposure to soy, peanuts, and pesticides would cause an asthma attack or anaphylaxis. Although her asthma medications helped relieve the stress involved with her symptoms, she stated that they caused side effects including jitteriness, nervousness, severe headaches, and frequent trips to the bathroom (Tr. 40, 42).

The plaintiff testified that she had become immune to many of the antibiotics prescribed to her and stated that she had a persistent infection for a year and a half that was treated with Sulfa (Tr. 43). The plaintiff reported having problems controlling her high blood sugar, which ranged from 138 to 274 (Tr. 44). She explained that the medications to control her blood sugar were not working effectively due to her constant infection. She stated that when her blood sugar levels increased, she experienced frequent urination, fatigue, and inability to concentrate. (Tr. 45).

The plaintiff stated that she suffered from pain in her right knee, which her doctor believed was arthritis brought on by her long-term use of prednisone (Tr. 45). She testified that the intensity of her right knee pain varied. At the hearing, she described her

15

knee pain at about two or three, but stated that "when it flares up, it's agonizing, probably an eight, nine" (Tr. 46).

In terms of activities, the plaintiff testified that she could wash the dishes, do light laundry, take care of herself, cook meals, and shop for groceries. She could walk a block on flat ground before needing to stop due to shortness of breath. She could walk up and down a flight of stairs, but there would usually be shortness of breath involved (Tr. 46-47). She could sit for about 30 minutes before needing to get up to readjust her knee and could stand for 30 minutes to an hour. She could lift 30 pounds but not repeatedly. She could lift about ten to 15 pounds throughout the day (Tr. 48).

The plaintiff stated that she would be unable to work on a consistent basis because she would need to miss work due to the symptoms related to her impairments. She explained that the side effects of her medication caused her to feel generally unwell and caused frequent urination (Tr.49). She estimated that she used the restroom 12 times a day or more while taking prednisone because it made her thirsty and elevated her blood sugar. She testified that, if she were employed, she would probably miss about eight days a month due to her symptoms (Tr. 52). Her past employers had asked her to go home and not return to work until her cough was under control. She finally stopped working because she had been missing too many appointments (Tr. 55).

### Testimony of Vocational Expert

The vocational expert classified the plaintiff's past work as a facial operator and a merchandiser as light and semi-skilled. He testified that the plaintiff's work in various sales jobs was semi-skilled/light exertion, but her work in the furniture store as she performed it was heavier than light (Tr. 56).

The ALJ's first hypothetical assumed an individual with the same age, education, and past work as the plaintiff with the RFC for lifting, carrying and handling 20 pounds on occasion and ten pounds frequently (Tr. 56-57). He further limited the

hypothetical to an individual with environmental limitations, which included: no exposure to excessive amounts of dust, fumes, gases, odors, other atmospheric irritants or pollutants, and extreme temperatures and humidity. Further limitations included no work at heights or around hazardous machinery and no climbing. The hypothetical individual could occasionally stoop, kneel, crouch and crawl. The vocational expert responded that such an individual could return to her past light work, but he noted that the plaintiff's past work in retail sales involved close contact with individuals, which could be problematic with her cough (Tr. 57).

The ALJ's second hypothetical assumed an individual who could not do any prolonged sitting, standing, or walking, and must be allowed to change positions at least every 30 minutes. The vocational expert opined that such an individual would be unable to return to the sales job or merchandiser jobs, but could work as an unskilled office helper and a mail clerk, each unskilled/light exertion (Tr. 58-59). The ALJ then assumed an individual that, in addition to the limitations set forth above, needed to take unscheduled breaks to use the restroom at least five to eight times a day for a minimum of ten minutes. The vocational expert replied that the need for an hour to an hour and a half of unscheduled breaks during an eight-hour day would further preclude any type of employment (Tr. 59).

The ALJ then inquired whether any work was available for an individual who, because of a medical impairment, would miss eight days of work a month. The vocational expert replied that such an individual would not be employable (Tr. 59).

## ANALYSIS

The plaintiff was 42 years old on the alleged disability onset date (August 28, 2008) and 44 years old on the date last insured (December 31, 2010). She completed a partial year at community college, basic law enforcement training, and obtained a license for aesthetics work. Before her disability, she was self-employed and ran a skin care

company from 2004 through 2008.  The plaintiff argues that the ALJ erred by (1) failing to discuss each impairment at step two; (2) improperly disregarding treating source opinions; (3) failing to make proper credibility findings; and (4) failing to consider the impact of her obesity in accordance with Social Security Ruling ("SSR") 02-1P.  The relevant time period before the ALJ and this court is August 28, 2008, through December 31, 2010 (*see* Tr. 15).

**Step Two**

The plaintiff first argues that the ALJ erred by failing to identify her type II diabetes as a severe impairment at step two of the sequential evaluation process (pl. brief at p. 10).  An impairment is considered "severe" only if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); *see Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (the "'mere presence of a condition is not sufficient to make a step-two showing'"; rather, the claimant must show "how it significantly limits her physical or mental ability to do basic work activities") (quoting *Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir. 2003)).  Here, the ALJ found that the plaintiff had the following severe impairments: asthma, chronic obstructive pulmonary disease, obesity, and hypertension (Tr. 14).  In the ALJ's consideration of the evidence at subsequent steps, he acknowledged that the plaintiff had been diagnosed by Dr. Jimenez with type II diabetes (Tr. 16) and also noted that the plaintiff testified to having diabetes and difficulty with controlling her blood sugar (Tr. 17).  Accordingly, any error at step two of the analysis was harmless because the ALJ nevertheless proceeded to the next steps of the sequential evaluation process and considered the plaintiff's diabetes at subsequent steps. *See Washington*, 698 F. Supp. 2d at 579-80 (explaining that even if an ALJ erroneously determines that impairment is not severe, reversal is not warranted as long as the ALJ considered the impairment in subsequent steps).

### Treating Physicians

The plaintiff next argues that the ALJ failed to properly consider the opinions of treating physicians Drs. Vande Stouwe and Love (pl. brief at pp. 10-11).  The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3)  the nature and extent of the treatment relationship; (4)  the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6)  whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5).  *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  SSR 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in the Ruling:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 404.1527].  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

On December 4, 2008, Dr. Vande Stouwe stated that the plaintiff had severe asthma that was difficult to control, and her symptoms worsened with little exertion and with exposure to assorted chemicals and scents; his medical opinion was that the plaintiff was disabled and unable to do any type of work for at least a year (Tr. 346). On March 3, 2010, Dr. Love stated his opinion that disability was unavoidably present (Tr. 630).

In assessing these two opinions, the ALJ noted that opinions on whether a claimant is disabled are not medical opinions; they are issues reserved to the Commissioner; and they are not entitled to any special significance (Tr. 19-20). *See* 20 C.F.R. § 404.1527(d) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . . "). The plaintiff argues, "Although the ALJ correctly noted that the above opinions were issues reserved to the Commissioner and could never be entitled to controlling weight, the ALJ's decision was not clear as to what weight, if any, was accorded to other medical opinions by Dr[s]. Vande Stouwe and Love with regard to [the plaintiff's] impairments" (pl. brief at p. 11). As noted by the Commissioner, however, the plaintiff fails to identify these "other medical opinions"; Drs. Vande Stouwe and Love both stated generally that the plaintiff was disabled, and although Dr. Vande Stouwe made reference to worsening symptoms with exertion, neither doctor offered his opinion as to any specific functional limitations (*see* Tr. 436, 630).

The ALJ stated that the opinions were "not given controlling or even great weight," as they were not supported by the overall findings of other health professionals included in the record (Tr. 19). Substantial evidence supports the ALJ's reasons for assigning Drs. Vande Stouwe's and Love's opinions less weight. The ALJ found, based on a review of the evidence as a whole, that the plaintiff was limited during the relevant period to "the low level of activity of light work activity," but that her alleged impairments did not occur with such frequency or severity to preclude all basic work activities on a sustained basis (Tr. 18). Specifically, the ALJ noted that the "most recent treatment notes showed

better control of her asthma symptoms" (Tr. 18). The ALJ further stated, "Treatment notes showed relative improvement in her asthma when off the steroids and antibiotics, after losing weight with testing showing only mild obstruction and mild restriction, with no severe flares of asthma" (Tr. 18). In March 2010, the plaintiff began to taper prednisone, and the next month, her measured forced vital capacity had increased by about 5%, her ratio remained the same, and she had only mild obstruction (Tr. 628, 630). In June 2010, Dr. Love reported that the plaintiff had no severe flares of asthma in the prior two months since her last appointment (Tr. 627). In September 2010, Dr. Love reported that the plaintiff's breathing had only mild obstruction with mild restriction (Tr. 623). She had been off prednisone since he last saw her, she had lost about ten pounds, and her asthma had relative improvement in pattern (Tr. 623). In December 2010, the plaintiff reported to Palmetto Ear, Nose, and Throat that she was able to breathe better (Tr. 600).

The ALJ further noted that "none of the [plaintiff's] other treating or examining physicians have . . . assessed any restrictions or limitations" (Tr. 20). The ALJ gave "significant weight" to the opinions of the state agency medical consultants, noting that they were consistent with the totality of the record (Tr. 20). Specifically, in August 2009, Dr. Meriwether opined that the plaintiff could lift ten pounds frequently and 20 pounds occasionally; sit, stand, or walk, for six hours each in an eight-hour workday; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and must avoid even moderate exposure to extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation (Tr. 408-15). In May 2010, Dr. Lang reviewed the plaintiff's medical records and completed a physical RFC assessment making similar findings (Tr. 520-27). The opinions of these state agency physicians support the ALJ's RFC finding that the plaintiff could perform a limited range of light with additional restrictions (*see* Tr. 15). *See* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians,

21

psychologists, and other medical specialists who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."); *Smith v. Schweiker*, 795 F.2d 343, 345-46 (4th Cir. 1986) (stating that a non-examining physician's opinion can be relied upon when it is consistent with the record and that, "if the medical expert testimony from examining or treating physicians goes both ways, a determination coming down on the side of the non-examining, non-treating physician should stand").

Based upon the foregoing, the undersigned finds that the ALJ properly considered the opinions of Drs. Vande Stouwe and Love.  Moreover, the undersigned finds that the ALJ's RFC finding is based upon substantial evidence and is without legal error as discussed above and as will be discussed below with regard to the ALJ's credibility finding.

### *Credibility*

The plaintiff next argues that the ALJ failed to make proper credibility findings (pl. brief at pp. 12-13).  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id.* at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and

persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

> (1)    the individual's daily activities;
>
> (2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> (3)    factors that precipitate and aggravate the symptoms;
>
> (4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> (5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> (6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

24

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. § 404.1529(c).

The ALJ found that while the plaintiff's impairments could reasonably be expected to cause the alleged symptoms, "the evidence during [the relevant period] did not support the [plaintiff's] allegations of symptoms that rendered her totally disabled from employment" (Tr. 18).  The plaintiff argues that the record contains "ample medical evidence in the record of [her] long-standing history of severe asthma" (pl. brief at p. 12). However, as argued by the Commissioner, the existence of the plaintiff's asthma satisfies just the first step of the credibility test of showing the existence of a medical impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). The ALJ acknowledged both that the plaintiff's asthma was severe and that the plaintiff satisfied the criteria of the first step of the credibility test by having a medically determinable physical impairment capable of producing the alleged symptoms (Tr. 14, 18).  However, in evaluating the second step of the credibility test, the ALJ found that the intensity, persistence, and limiting effects of her symptoms were not as severe as alleged (Tr. 18).

In making this finding, the ALJ noted the evidence described above showing relative improvement in the plaintiff's asthma over the relevant period; testing showing only mild obstruction and mild restriction; no severe flares of asthma over a significant period of time; and the ability of the plaintiff to engage in a fairly wide range of daily activities (Tr. 18-20).  The ALJ specifically noted that the plaintiff's daily activities "were indicative of a fairly active and varied lifestyle and were not representative of a significant restriction of activities, constriction of interests, or impaired social functioning" (Tr. 19).  The plaintiff reported that she was able to drive, prepare daily meals, take care of pets, take care of personal hygiene, do laundry and dishes, go outside on a daily basis, shop in stores and

25

on the computer, handle money, read, watch television, play chess, socialize with friends, and pay attention as long as she needs to (Tr. 17-19; *see* Tr. 167-74).

Furthermore, as argued by the Commissioner, although the ALJ did not find the plaintiff's subjective allegations fully credible, much of her testimony is reflected in the RFC. For instance, the plaintiff stated that she could sit for 30 minutes and stand for 30-60 minutes before needing to change positions, and the ALJ determined that the plaintiff must be able to alternate between sitting and standing every 30 minutes (Tr. 15, 17, 48). The plaintiff stated that she could carry up to 30 pounds, although not repeatedly, and lift ten to 15 pounds throughout the day (Tr. 17, 48). The RFC limits her to carrying up to ten pounds frequently and 20 pounds occasionally (Tr. 15). Thus, although the ALJ did not find the plaintiff's alleged limitations fully credible, he did partially account for her testimony in the RFC.

The plaintiff argues that the ALJ overlooked evidence when he made the statement that the "record did not contain documentation or any other treatment notes, office records, hospital records or mental health records indicating the claimant received any specialized medical care" (pl. brief at p. 12 (citing Tr. 19)). However, as argued by the Commissioner, it appears that the ALJ was referring to the plaintiff's treatment for mental health conditions. The ALJ noted earlier in his decision that Dr. Jimenez had prescribed the plaintiff medication for insomnia and anxiety issues, but that no psychiatric care had been recommended, and Dr. Jimenez completed two questionnaires in which she assessed no or slight work-related limitations in function due to insomnia and anxiety (Tr. 16; *see* Tr. 268, 391). While the plaintiff argues that the ALJ "overlooked evidence" that she presented to the emergency room in August 2008, August 2009, and October 2009, for treatment of allergy-induced asthma attacks (pl. brief at p. 12), the ALJ specifically cited and discussed these hospital visits in his discussion of the plaintiff's physical impairments (Tr. 15-16). The ALJ also cited evidence showing the plaintiff received care for her physical impairments

from specialists including Drs. Vande Stouwe, Love, and Mayson, as well as specialists at Duke University Hospital (Tr. 15-18). Accordingly, the plaintiff's allegation that the ALJ overlooked this evidence is without merit.

The plaintiff further contends that while steroid therapy helped her asthma symptoms, the ALJ failed to consider its side effects, including exacerbation of her diabetes that led to frequent urination (pl. brief at pp. 12-13). However, in discussing the plaintiff's testimony, the ALJ explicitly noted the plaintiff's statements about her frequent urination (Tr. 17). Additionally, in evaluating her credibility, the ALJ noted that in 2010 the plaintiff tapered and went off prednisone (Tr. 16-18; *see* Tr. 623-30). The undersigned finds that the ALJ properly considered the plaintiff's steroid therapy and her testimony as to its side effects.

Based upon the foregoing, the ALJ's credibility finding is based upon substantial evidence and is without legal error.

### Obesity

Lastly, the plaintiff argues that the ALJ failed to consider the impact of her obesity in accordance with SSR 02-1p (pl. brief at p. 13). The Ruling recognizes that obesity can cause limitations of function in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability to tolerate extreme heat, humidity, or hazards. SSR 02-1p, 2000 WL 628049, at *6. These issues must be considered in assessing a claimant's RFC. *Id.* The Ruling states that "individuals with obesity may have problems with the ability to sustain a function over time" and that "[i]n cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity." *Id.* The Ruling also states:

> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

*Id.* Further, "[a]s with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." *Id.* at *7.

The plaintiff argues that the ALJ "failed to discuss any possible impact that the combination of sleep apnea and obesity would have on [her] residual functional capacity" (pl. brief at p. 13). However, in determining the plaintiff's RFC, the ALJ evaluated the plaintiff's obesity in conjunction with her other impairments and found that "during the relevant period, the claimant's obesity and respiratory problems limited her to the low level activity of light work" (Tr. 18). Additionally, the ALJ acknowledged the plaintiff's testimony regarding the need to sleep sitting up because she felt as if she was suffocating when lying down, in relation to possible sleep apnea and obesity (Tr. 17). However, the plaintiff points to no medical evidence to support the existence of a functional limitation on that basis. The ALJ discussed substantial evidence supporting the level of functioning detailed in the RFC, including the plaintiff's ability to engage in a wide range of activities (Tr. 17-19) and the opinions of the state agency consultants, who opined, based on the medical evidence and specific consideration of the plaintiff's obesity (Tr. 413, 525), that the plaintiff could perform a range of light work on a regular and continuing basis (Tr. 20; *see* Tr. 408-415, 520-527). Even where an ALJ does not squarely address obesity, which was not the case here, courts have reasoned that the error is harmless if the ALJ indirectly accounted for the effects of obesity by adopting limitations suggested by doctors who were aware of the condition. *See Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)) (finding ALJ's failure to discuss claimant's obesity was harmless error where the ALJ's decision was based on the opinions of physicians who had considered obesity and where claimant failed to specify how her obesity further impaired her ability to work); *Bailey v. Astrue*, No. 1:10cv110, 2013 WL 140263, at *11 (M.D.N.C. Jan. 10, 2013) ("[T]his Court concludes that the ALJ considered Plaintiff's obesity implicitly by giving weight to treating sources and non-examining physicians who observed and noted

28

Plaintiff's obesity."); *McKinney v. Astrue*, No. 1:11-cv-199, 2012 WL 6931344, at *3 (W.D.N.C. Dec. 11, 2012) ("Because Plaintiff has failed to set forth how her obesity further impaired her ability to work, and because the ALJ implicitly considered Plaintiff's obesity by considering the medical evidence in the record, as well as the opinions of state agency physicians who addressed Plaintiff's obesity and found it imposed no additional impairments . . . any error in failing to explicitly mention obesity in the decision was harmless."), *adopted by* 2013 WL 300822 (W.D.N.C. Jan. 25, 2013).  The plaintiff points to no evidence that her obesity limited her functioning beyond what the state agency physicians and, ultimately, the ALJ assessed.

Based upon the foregoing, this allegation of error is without merit.

## CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and is free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 22, 2014
Greenville, South Carolina

29